IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| BRADLEY DEWALL, M.D. and WOUND MANAGEMENT CONSULTANTS, P.C. | ) ) ) ) ) | No. 3:21-cv-10 |
| Plaintiffs, | ) ) ) | COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF |
| v. | ) ) | |
| MEDICAL PROTECTIVE COMPANY, | ) ) | |
| Defendant. | ) ) ) | |

I.  <u>Nature of the Action</u>

1.      Plaintiffs Dr. Bradley DeWall ("Dr. DeWall") and Wound Management Consultants, P.C. ("WMC") (collectively "Plaintiffs") assert this insurance coverage action for declaratory judgment, breach of contract and bad faith arising from the denial of defense and indemnification obligations owed by Defendant Medical Protective Company ("MedPro") to Dr. DeWall and WMC under the MedPro Policies (defined below) for the underlying Genesis Arbitration (defined below).

2.      The Genesis Arbitration is an ongoing dispute between Plaintiffs and the Genesis Health System ("Genesis") wherein Genesis seeks reimbursement of nearly $1 million from Dr. DeWall and WMC, with Genesis at its core contending that Dr. DeWall and WMC failed to provide professional services, including patient treatment authorization and the related documenting patients' medical files, such that Genesis could in turn provide "administrative billing functions" in order to submit such professional services rendered by Dr. DeWall and WMC to

Medicare for payment.  Under this arrangement, Genesis contends it provided only "administrative billing functions", while Dr. DeWall and WMC were responsible for "determin[ing] the care a patient received" – the professional services rendered, covered by the MedPro Policies at issue here:

- Genesis's administrative billing functions: "Genesis employed case managers (RNs) who performed administrative billing functions" in connection with seeking Medicare payment for services rendered to patients by Dr. DeWall and WMC (Exhibit 3, Genesis Amended Arbitration Complaint, ¶ 36);

- Genesis's administrative billing functions: "The [Genesis] case managers (RNs) who performed administrative billing functions . . . relied on Dr. DeWall and WMC's policies, procedures and protocols . . . for HBO therapy services [rendered to patients]."  (*Id*. at ¶ 37);

- Genesis's administrative billing functions: "The case managers (RNs) who performed administrative billing functions . . . relied on WMC physicians to appropriately document the medical records to support HBO therapy services provided." (*Id*. at ¶ 38);

- Based on DeWall's and WMC's professional services to patients: "It was the responsibility of physicians assigned to [Genesis's Wound Care] Clinic to determine the care a patient received, not Genesis' case managers (RNs) who performed administrative billing functions" (*Id*. at ¶ 94);

- Again, DeWall's and WMC's professional services to patients: "WMC's physicians [Dr. DeWall] had an obligation to adequately document the medical records . . . If the physician ordered treatment, the physician was required to assess

and document the physician's findings to justify the treatment." (*Id*. at ¶¶ 92, 95); and

- The crux of Genesis's claims at issue: "Dr. DeWall . . . personally provided hyperbaric therapy services for patients . . . Dr. DeWall failed to ensure the clinical documentation he personally prepared for hyperbaric therapy services complied" so that Genesis could submit the same and be paid by Medicare for professional services rendered.  (*Id*. at ¶¶ 97, 99.)

At its core, Genesis contends that Dr. DeWall's and WMC's failure to provide professional services to patients, including allegedly incorrectly documenting such patient services, rendered defective Genesis's administrative billing of those services -- causing Genesis to have to reimburse Medicare for payments for said services -- for which Genesis seeks reimbursement from Dr. DeWall and WMC.  Simply put, Genesis is complaining about Dr. DeWall's and WMC's rendering of professional services, triggering coverage under the MedPro Policies.

3.      Plaintiffs seek a declaration regarding the rights and obligations of the Parties under insurance policies they purchased from MedPro, including that MedPro has a duty to defend (and indemnify) Dr. DeWall and WMC against Genesis's claims (and reimburse Dr. DeWall and WMC their defense expenses already incurred); damages to remedy MedPro's breach of contracts (the MedPro Policies); and bad faith damages arising from MedPro's meritless denial of coverage here.

II.    The Parties

4.      Plaintiff Dr. Bradley DeWall ("Dr. DeWall") is a citizen of the State of Iowa and resides in LeClaire, Scott County, Iowa.

5.      Plaintiff Wound Management Consultants, P.C. ("WMC") is a professional corporation organized and existing under the laws of the State of Iowa.  WMC is, and at all times material hereto has been, exclusively owned and managed by Dr. DeWall.

6.      Defendant Medical Protective Company is an insurance company organized and existing under the laws of the State of Indiana, with its principal place of business in Fort Wayne, Indiana.

III.    <u>Jurisdiction and Venue</u>

7.      This declaratory judgment action is brought pursuant to 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57.

8.      An actual justiciable controversy exists between Plaintiffs and MedPro within the meaning of 28 U.S.C. § 2201 regarding whether MedPro has a duty to reimburse defense costs, otherwise defend and indemnify Plaintiffs against the Genesis Arbitration under the MedPro Policies, as more particularly described below.

9.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and this action is between citizens of different states.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

IV.     <u>The MedPro Policies at Issue</u>

11.     Dr. DeWall is the holder of MedPro Policy No. 686137 ("DeWall Policy"), effective from December 15, 2019 to December 15, 2020 with a retroactive date of December 15, 2000, attached hereto as Exhibit 1.

12.     The DeWall Policy provides coverage on a claims-made basis without limits with respect to defense costs, and $1,000,000 per-claim and $3,000,000 annual aggregate limits with respect to indemnity. (Exhibit 1 at p. 3.)

13.     WMC is the holder of MedPro Policy No. C51011 ("WMC Policy"; the DeWall Policy and WMC Policy are collectively the "MedPro Policies"), effective from December 15, 2013 to December 15, 2014 with a retroactive date of January 23, 2009. Per endorsement, the WMC Policy provided an extended reporting period. (*See* Exhibit 2, WMC Policy, Endt. 780.)

14.     The WMC Policy provides coverage on a claims-made basis without limits with respect to defense costs, and $1,000,000 per-claim and $3,000,000 annual aggregate limits with respect to indemnity. (Exhibit 2 at p. 3.)

15.     In both Policies, MedPro "agree[d] to defend and pay damages, in the name and on behalf of the Insured . . . [i]n any claim first made . . . during the term of this policy based upon professional services rendered, or which should have been rendered, after the retroactive date by the Insured." (Exhibit 1, Endt. 828 at p. 1; Exhibit 2, Endt. 829 at p. 1.)

16.     Both Policies define "professional services" to include "the rendering of medical, surgical, dental, or nursing services to a patient and the provision of medical examinations, opinions, or consultations regarding a person's medical condition within the Insured's practice as a licensed health care provider." (Exhibit 1, Endt. 828 at p. 2; Exhibit 2, Endt. 829 at p. 2.)

17.     Both Policies include an endorsement entitled "MEDICARE/MEDICAID BILLING ACTIONS LIMITED DEFENSE COVERAGE" (the "Medicare Endorsement") which purports to "broaden[]" MedPro's duty to defend "to include the defense of an Insured in an investigation, civil suit and/or administrative proceeding *which is brought by a state or federal*

*agency* which alleges improper submission of claims for reimbursement under the Medicare or Medicaid program." (Exhibits 1 and 2, Endt. 295) (emphasis added.)

18.     The Medicare Endorsement is not applicable on its face[1] because the Genesis Arbitration is not brought by a state or federal agency, but rather by a private party -- Genesis. Nonetheless, MedPro initially paid DeWall's and WMC's defense costs incurred in the Genesis Arbitration (albeit only the defense limits of $25,000 per Policy under these Endorsements), importantly conceding that the underlying Genesis claims arise from the professional services:  to be covered, the underlying claims "must arise from . . . professional services rendered or which should have been rendered" by Dr. DeWall and WMC.  (Exhibits 1 and 2, Endt. 295) (emphasis added.)

V.     <u>The Genesis Arbitration Alleges Plaintiffs' Breached Patient Care Responsibilities</u>

19.     The claims for which Plaintiffs seek coverage here are asserted in an arbitration initiated by Genesis Health System ("Genesis") in January 2020 on the basis Plaintiffs' role in providing professional services to patients in connection with operating a healthcare clinic (the "Clinic") owned by Genesis (the "Genesis Arbitration"). (Exhibit 3, Genesis Amended Arbitration Complaint (served 7/15/20).)

20.     In the Genesis Arbitration, Genesis alleges that it provides various health care services to patients in Iowa and Illinois, and that in doing so it coordinated with Dr. DeWall and

---

[1] While the Medicare Endorsement limits defense coverage to "$25,000 in defense costs for any single . . . investigation, civil suit and/or administrative proceeding" (Exhibits 1 and 2, Endt. 295, ¶¶ 5-6), it recognizes that claims "aris[ing] from bills or requests for reimbursement for professional services rendered or which should have been rendered by the Insured" may be covered under the MedPro Policies by allowing for indemnity coverage where the "such damages are otherwise payable under the policy." (*Id*., ¶ 2.)

WMC in operation of the Clinic, specializing in wound care and hyperbaric medicine. (*Id*. at ¶¶ 6-7.)

21.     According to Genesis, at the Clinic patients were treated by Dr. DeWall and WMC with hyperbaric oxygen therapy ("HBO therapy"), which involves giving a patient high concentrations of oxygen within a pressurized chamber in which the patient intermittently breaths 100-percent oxygen. (*Id*. at ¶ 87 and Exhibit 14 referenced therein, "Wisconsin Physicians Service Paid Providers for Hyperbaric Oxygen Therapy Services That Did Not Comply With Medicare Requirements".)

22.     On or about February 1, 2013, WMC and Genesis entered into a Management Services Agreement ("2013 Agreement"), whereby Genesis retained Dr. DeWall and WMC to assist in the operation of the Clinic, including to "standardize patient care within the Clinic." (*See* Exhibit 4, Management Services Agreement (also included as part of Exhibit 3 herein and referred to therein as "Exhibit 1"); Exhibit 3 at ¶ 8.)

23.     On or about February 1, 2016, WMC and Genesis entered into the Amended and Substituted Management Services Agreement ("2016 Agreement"), whereby Genesis continued to retain Dr. DeWall and WMC to assist its operation of the Clinic, including continuing to provide "standardize[d] patient care within the Clinic." (*See* Exhibit 5, Amended and Substituted Management Services Agreement (also included as part of Exhibit 3 herein and referred to therein as "Exhibit 2").)

24.     Genesis's Amended Arbitration Complaint alleges that Plaintiffs had substantial patient care responsibilities at the Clinic and pursuant to the 2013 and 2016 Agreements, including "overseeing the day-to-day delivery of all Wound Management program services at the Clinic, including 'treatment, authorization and documentation.'" (Exhibit 3 at ¶ 93.)

25.     Genesis contends Dr. DeWall was "the only full-time physician in the Clinic" and "treated the majority of the patients who were seen in the Clinic," including personally "provid[ing] hyperbaric therapy services for patients." (*Id*. at ¶ 97.)

26.     The "physicians assigned to the Clinic," including Dr. DeWall and WMC, had "the responsibility . . . to determine the care a patient received," and when a "physician ordered treatment, the physician was required to assess and document the physician's findings to justify the treatment." (*Id*. at ¶¶ 94-95.)

27.     Under both Agreements, WMC and DeWall were charged with patient care responsibilities ("WMC shall have the responsibility for . . . Develop[ing] the systems of care for patients . . . expand[ing] wound care services . . . [and] expand[ing] the inpatient wound care program"), while Genesis had responsibility for the billing services at the Clinic ("Genesis shall retain responsibility . . . for the billing of the technical function for the operation of the Clinic". (Exhibits 4 and 5 at ¶ 4.1.)

28.     Accordingly, Genesis contends that "Genesis employed case managers (RNs) who performed administrative billing functions in connection with the Clinic": these "Genesis[-]employed . . . case managers (RNs) who performed administrative billing functions in connection with the Clinic relied on WMC physicians to appropriately document the medical records to support HBO therapy services provided at the Clinic." (Exhibit 3 at ¶¶ 36-38.)

29.     These "Genesis[] case managers (RNs) who performed administrative billing functions in connection with the Clinic" had no responsibility for "determine[ing] the care a patient received" – instead Dr. DeWall and WMC held the responsibility "to determine the care a patient received". (*Id*. at ¶ 94.)

30.     Genesis retained "ultimate approval and authority" with respect to the administration and management of the Clinic. (Exhibits 4 and 5 at ¶ 1.)

31.     In sum and as alleged by Genesis within the Genesis Arbitration, the 2013 and 2016 Agreements provided the Dr. DeWall and WMC would render professional services in their assessing, authorizing, and treatment of patients, and Genesis would use the information from Plaintiffs to submit claims for payment of bills ("Genesis[] case managers (RNs) [] performed administrative billing functions in connection with the Clinic."). (Exhibit 3 at ¶94.)

32.     <u>WPS Reimbursement</u>.  In the Genesis Arbitration, Genesis alleges that Dr. DeWall and WMC are liable for money Genesis paid to Wisconsin Physician Service Insurance Corporation ("WPS"), a Centers for Medicare & Medicaid Services ("CMS") contractor. (Exhibit 3 at ¶ 43.)

33.     Throughout 2013 to 2018 and pursuant to the 2013 and 2016 Agreements, Genesis submitted to WPS claims for reimbursement under Medicare Part B for HBO therapy services provided at the Clinic. (*Id*. at ¶ 87.)

34.     Medicare coverage for HBO therapy is determined by National Coverage Determination 20.29 ("NCD 20.29") issued by CMS. (*Id*. at ¶ 88.)

35.     NCD 20.29 allows coverage for HBO therapy under Medicare Part B, but only under limited circumstances:

> a.     HBO therapy is a covered treatment for certain conditions, including diabetic wounds of the lower extremities and chronic refractory osteomyelitis. (*Id*.)

> b.     For lower-extremity diabetic wound treatment to be covered, "the patient's records must support that the patient has (1) type I or type II diabetes and has a lower extremity wound that is due to diabetes, (2) a wound classified as Wagner grade III or higher, and (3) failed an adequate course of standard therapy." (*Id*.)

> c.     "HBO therapy is covered as adjunctive therapy for diabetic wounds of lower extremities only after there are no measurable signs of healing for at least 30 days of treatment with standard wound therapy and must be used in addition to standard wound care." (*Id*.)

      d.    For chronic refractory osteomyelitis to be covered, documentation "must support that the condition was unresponsive to both conventional medical and surgical management." (*Id*.)

36.     In February 2018, the CMS Office of Inspector General ("OIG") issued a report that determined that WPS had paid claims for HBO therapy that did not comply with these Medicare requirements, and it recommended WPS recover from providers, including Genesis, any overpayments. (*Id*. at ¶¶ 55-58.).

37.     The OIG report noted that "the medical records did not always support that HBO therapy was provided as treatment for a covered condition. Additionally, the medical records did not always support that HBO therapy was provided only after standard or conventional treatment failed." (*Id*., ¶ 90.)

38.     <u>Separately from the OIG audit</u>, Genesis alleges that WPS conducted a Targeted Probe and Educate ("TPE") review of a more limited number Genesis's claims for reimbursement for HBO therapy services. (*Id*. at ¶¶ 43-51, 82-84.)

39.     The TPE allegedly identified a number of overpayments based on "issues . . . relate[d] exclusively to treatment authorization and documentation." (*Id*. at ¶¶ 84-85.)

40.     All told, Genesis contends it repaid to WPS a total of $773,779.00 for uncovered HBO therapy claims, and it now seeks compensation from Plaintiffs for the amounts it repaid to WPS and costs it incurred in conducting their investigation and audit. (*Id*. at ¶ 74.)

41.     Genesis claims these damages stem from Plaintiffs' alleged failures to perform, including the "the day-to-day treatment authorization and documentation for wound management program services at the Clinic" (*id*. at ¶ 110), which ultimately resulted in unauthorized HBO therapy claims and reimbursement to WPS. (*Id*. at ¶¶ 108-116, 137-143.)

42.     Plaintiffs' alleged failures necessarily stem from their rendering of professional services at the Clinic. For example, a claim for HBO therapy reimbursement could have failed to meet NCD 20.29 authorization standards because Plaintiffs, during their treatment or examination of a patient, did any one of the following:

      a.    incorrectly diagnosed that a treated wound was due to diabetes;

      b.    improperly determined the Wagner grade scale of a treated wound;

      c.    misjudged the adequacy of or responsiveness to standard or conventional treatments;

      d.    failed to identify measurable signs of healing in a wound;

      e.    forewent any of the above assessments.

(*Compare id*. at ¶ 88 (explaining patient treatment and documentation standards under NCD 20.29) *with id*. at ¶¶ 110-115; 140-141 (alleging Plaintiffs failed to provide patient "treatment authorization and documentation."))

43.     A claim for HBO therapy reimbursement could also have allegedly failed to meet NCD 20.29 standards if Plaintiffs' documentation of their assessment and treatments of patients was incomplete or inaccurate as to any of the above requirements.  (*Id*.)

44.     In sum, Genesis seeks reimbursement from Dr. DeWall and WMC because, starting in 2013, "WMC and Dr. DeWall failed to ensure clinical documentation was accurate and/or adequate for claim submission . . . Dr. DeWall failed to ensure the clinical documentation he personally prepared for [HBO] services complied" for Medicare reimbursement.  (*Id*., ¶¶ 86-87, 89, 92-99.)

45.     In this way, Genesis's claims that Plaintiffs caused them to bill WPS for uncovered HBO therapy services are "based on" the rendering or failure to render professional services as defined in the MedPro Policies: "the rendering of medical . . . services to a patient and the provision

of medical examinations, opinions, or consultations regarding a person's medical condition." (Exhibit 1, Endt. 828 at p. 2; Exhibit 2, Endt. 829 at p. 2.)

46.     This is so given, per Genesis's allegations, Genesis personnel "performed administrative billing functions in connection with the Clinic" (Exhibit 3 at ¶ 36), while Dr. DeWall and WMC were to conduct "the day-to-day delivery of all Wound Management program services at the Clinic, including 'treatment, authorization and documentation.'" (*Id*. at ¶ 93.)

47.     <u>Employee Salary Claims</u>.  Genesis's Arbitration claims are also based on WMC's employment of (or failure to employ) medical staff, who were to provide medical services in the following positions: a Program/Clinical Director, a Safety Director, and an HBO Technician. (*Id*. at ¶¶ 118; 126.)

48.     The Program/Clinical Director was to be "a registered nurse with experience in the provision of nursing services related to wound management and hyperbaric medicine and the administration and oversight of wound care clinics," while the Safety Director and HBO Technician were to "be appropriately trained and experienced in the management and operation of hyperbaric oxygen chambers" and "providing support to the Clinic." (Exhibits 4 and 5 at ¶¶ 3.3(a)-(b).)

49.     WMC allegedly "did not employ three individuals for these positions," but instead, "had the same individual serving as the Program/Clinical Director, the Safety Director and/or HBO Technician," again, in essence, a failure to render professional services. (Exhibit 3 at ¶¶ 104-105.)

50.     Genesis is seeking reimbursement for the salaries it paid for the allegedly-unfilled positions – again claims anchored in "professional services rendered or which should have been rendered" by Dr. DeWall and WMC, triggering coverage under the MedPro Policies. (*Id*. at ¶¶ 123, 132.)

VI.    Plaintiffs' Demands for Coverage; MedPro's Meritless Denials

51.    Dr. DeWall and WMC timely notified MedPro of the Genesis Arbitration. Acknowledging the MedPro Policies were triggered by Genesis Arbitration claims, MedPro initially began defending Plaintiffs, because after "review of the Medicare Endorsement included in [Plaintiffs'] policy," MedPro "concur[red] that it is triggered by the Genesis Arbitration." (Exhibit 6, correspondence regarding notice of Genesis Arbitration to MedPro, MedPro's T. Springman 1/23-24/20 emails to Dr. DeWall.)

52.    MedPro initially insisted that, based on the inapplicable Medicare Endorsement, Plaintiffs "have a total of $50,000 in coverage for legal fees and expenses incurred in the arbitration". (*Id*., S. Heil 2/24/20 email to Dr. DeWall.)

53.    In addition, MedPro and offered to send a coverage "acknowledgment letter that will confirm your coverage" of the Genesis Arbitration under both MedPro Policies, but never did so before it began reimbursing Plaintiffs' defense costs. (*Id*., T. Springman 1/23-24/20 emails to Dr. DeWall; T. Springman 4/6/20 email to Dr. DeWall and Kevin Collins, confirming reimbursement of defense costs.)

54.    On multiple occasions, Plaintiffs demanded coverage beyond that provided in the Policies' (inapplicable on this face) Medicare Endorsement, including continued defense and indemnity, pointing out that "assessment, authorization, treatment, and documentation 'regarding a person's medical condition within the Insured's practice," as Genesis alleges "clearly entails the exercise of a medical professional's specialized training and knowledge, and Genesis's claims are 'based on' the 'rendering of medical . . . services to a patient and the provision of medical examinations, opinions, or consultations regarding a person's medical condition,' thereby squarely

falling within the Policies' definition of 'professional services.'" (Exhibit 7, correspondence demanding coverage, T. Hill 8/19/20 letter to MedPro's T. Springman at p. 2.)

55.     Plaintiffs also pointed out to MedPro that "because MedPro has already paid a portion of WMC's and Dr. DeWall's defense expenses (including both attorneys and expert fees) incurred in the Genesis Arbitration pursuant to each Policy's [Medicare Endorsement], which coverage 'arise[s] from . . . professional services rendered or which should have been rendered', MedPro ha[d] already acknowledged that the Genesis Arbitration claims are "based on professional services rendered or which should have been rendered'." (*Id*. at p. 3.)

56.     Plaintiffs further noted that the Medicare "endorsement does not apply on its face, as it provides coverage in response to applicable claims 'brought by a state or federal agency,' which is not the case with the Genesis Arbitration at issue", and that MedPro undertook Plaintiffs' defense "without reserving rights under the Policies, thus waiving Policy defenses." (*Id*., T. Hill 10/28/20 letter to MedPro's G. Lambert at p. 4.)

57.     MedPro improperly denied Plaintiffs' coverage demands on the false premise that the Plaintiffs' liability in the Genesis Arbitration was based solely on "billing" rather than Dr. DeWall's and WMC's provision of professional services, simply choosing to ignore the Genesis Arbitration allegations (and MedPro's prior "acknowledgement [of] . . . your coverage" to the detriment of Plaintiffs). (Exhibit 6, MedPro's T. Springman 1/23-24/20 emails to Dr. DeWall.)

58.     Contrary to MedPro's position, courts routinely hold that claims alleging improper or erroneous billing are covered under professional services policies where, as here, there is a causal connection between the professional services and the billing. *E.g., Affinity Living Group, LLC v. StarStone Specialty Ins. Co*., 959 F.3d 634, 643 (4th Cir. 2020) (ruling the insurer was obligated to defend its insured by holding that medical billing falls within "professional services"

definition where the rendering or "failure to 'render medical professional services' bears a causal relationship to the billing."); *Hartford Fire Ins. Co. v. Whitehall Convalescent & Nursing Home, Inc.*, 321 Ill. App. 3d 879, 889 (2001) (ruling a duty to defend existed, holding that allegedly-fraudulent billing practices for prescription drugs were done "in connection with" furnishing professional medical treatment and triggered coverage of nursing homes under insurer's professional services policy).

59.     To date, Dr. DeWall and WMC have incurred well-over $130,000 in fees and expenses defending the Genesis Arbitration, and MedPro has not fully reimbursed Plaintiffs for these expenses as required under the MedPro Policies.  Instead, MedPro has paid only $50,000 under the inapplicable Medicare Endorsement of both Policies, and it has refused to further defend or indemnify Plaintiffs in the Genesis Arbitration.

60.     MedPro owes Plaintiffs at least $83,055 in un-reimbursed defense expenses incurred to date, plus an ongoing defense and indemnification of Dr. DeWall and WMC against the Genesis Arbitration.

## Count I: Declaratory Judgment

61.     Plaintiffs restate Paragraphs 1 through 60 above as if fully set forth here.

62.     An actual, ripe, and justiciable controversy has arisen and now exists between Plaintiffs and MedPro concerning whether Plaintiffs are entitled to insurance coverage for the claims asserted against them in the Genesis Arbitration within the meaning of 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57.

63.     Pursuant to the MedPro Policies, MedPro is obliged to defend and indemnify Plaintiffs for "any claim" that is "based upon professional services rendered, or which should have

been rendered, after the retroactive date by the Insured." (Exhibit 1, Endt. 828 at p. 1; Exhibit 2, Endt. 829 at p. 1.)

64.     Under Iowa law, an insurer's "*duty to defend* rests *solely* on whether the petition [here the Genesis Amended Arbitration Complaint, Exhibit 3] contains *any allegations* that *arguably* or *potentially* bring the action within the policy coverage." *United Fire & Cas. Co. v. Shelly Funeral Home, Inc*., 642 N.W.2d 648, 656 (Iowa 2002) (quoting *Employers Mut. Cas. Co. v. Cedar Rapids Television Co*., 552 N.W.2d 639, 641 (Iowa 1996) (emphasis in original). *See also Employers Mut. Cas. Co*, 552 N.W.2d at 642 (holding that, in determining the duty to defend, "an insurance company is to look at the *allegations of fact* in [a] plaintiff's petition against the insured and not the *legal theories* on which [the plaintiff] claims insured is liable.") (emphasis in original).

65.     As set forth more fully above, Counts I and V in the Genesis Amended Arbitration Complaint (Exhibit 3) contain allegations giving rise to the reasonable inference that Plaintiffs' liability stems from their rendering or failure to render "professional services" as defined by the MedPro Policies.

66.     Moreover with respect to Counts II and III of Exhibit 3 (Genesis Amended Complaint), given the roles the relevant employees were to allegedly hold at the Clinic, these Genesis allegations of the failure to employ them constitutes a claim "based on . . . professional services rendered, or which should have been rendered" under the Policies. (Exhibit 1, Endt. 828 at p. 1; Exhibit 2, Endt. 829 at p. 1.)

67.     Iowa courts "view the provisions of an insurance policy 'in a light favorable to the insured.'" *Lee v. Grinnell Mut. Reinsurance Co*., 646 N.W.2d 403, 406 (Iowa 2002) (quoting *A.Y. McDonald Indus. v. Ins. Co. of N. Am*., 475 N.W.2d 607, 619 (Iowa 1991). "If the words are fairly susceptible to two interpretations the one which will sustain the insured's claim will be accepted."

*Genesis Ins. Co. v. City of Council Bluffs*, 677 F.3d 806, 811 (8th Cir. 2012) (citing *Cent. Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)).  Moreover, it is well-established under Iowa law "that when 'any claim alleged against the insured can rationally be said to fall within such coverage, the insurer must defend the entire action' and doubts regarding the extent of the insured's coverage should be resolved in the insured's favor." *Maxim Techs., Inc. v. City of Dubuque*, 690 N.W.2d 896, 902 (Iowa 2005); *Employers Mut. Cas. Co,* 552 N.W.2d at 641 (holding that "*the duty to defend* rests solely on whether the petition contains any allegations that *arguably* or *potentially* bring the action within the policy coverage.") (emphasis in original); *First Newton Nat. Bank v. General Cas. Co. of Wisconsin*, 426 N.W.2d 618, 630 (Iowa 1988) ("because there is at least one covered claim . . . the [insurer] must provide a defense on all counts in that action").

68.     As set forth more fully above, the Medicare Endorsement does not limit the coverage, but instead by MedPro providing coverage under the Medicare Endorsement, MedPro has acknowledged that the Genesis Arbitration "arise[s] from bills or requests for reimbursement for professional services rendered or which should have been rendered by" Plaintiffs. (Exhibits 1 and 2, Endt. 295.)  MedPro also assumed defense of Dr. DeWall and WMC without reserving any rights under the MedPro Policies, thus waiving defenses to coverage. *E.g., Westfield Ins. Companies v. Econ. Fire & Cas. Co.*, 623 N.W.2d 871, 879 (Iowa 2001) (holding that when an insurance company assumes the defense of an action, with knowledge of facts which would have permitted it to deny coverage, it is estopped from subsequently raising the defense of non-coverage).

WHEREFORE, Dr. DeWall and WMC request that the Court enter the following judgment in their favor and against MedPro:

1.      Awarding Plaintiffs' all non-reimbursed defense expenses incurred in the Genesis Arbitration;

2.      MedPro is obligated to further defend Plaintiffs going forward in the Genesis Arbitration;

3.      Pursuant to the MedPro Policies, MedPro is obligated to indemnify Plaintiffs against all liability incurred in the Genesis Arbitration;

4.      Awarding Plaintiffs all compensatory and consequential damages against MedPro in an amount to be proven at trial, as well as costs, pre- and post-judgment interest, disbursements, expenses and attorneys' fees incurred arising from this Action and/or establishing coverage under the MedPro Policies;

5.      Awarding Plaintiffs punitive damages against MedPro; and

6.      Awarding such other and further relief as the Court may deem just.

<u>Count II: Breach of Contract</u>

69.     Plaintiffs restate Paragraphs 1 through 68 above as if fully set forth here.

70.     The MedPro Policies constitutes valid, binding contracts between Plaintiffs and MedPro.

71.     Plaintiffs have at all times performed their obligations under the terms of the MedPro Policies, including payment of the required premium and providing timely notice.

72.     Given the claims asserted by Genesis in the Genesis Arbitration, MedPro's obligations to provide full coverage under the MedPro Policies has been triggered.  As set forth above, MedPro has already acknowledged its Policies have been triggered by the claims asserted against Plaintiffs in the Genesis Arbitration, and has paid some defense costs incurred in the

Arbitration without asserting any reservation of rights, but now refuses to provide any additional defense or indemnification to Plaintiffs.

73.     MedPro's current denial of coverage to Plaintiffs for the claims asserted in the Genesis Arbitration constitute a breach of the MedPro Policies.

74.     As a result of MedPro's breach, Plaintiffs have suffered, and will suffer, compensatory and consequential damages in an amount to be proved at trial.

WHEREFORE, Dr. DeWall and WMC request that the Court enter the following judgment in their favor and against MedPro:

1.     Awarding Plaintiffs' all non-reimbursed defense expenses incurred in the Genesis Arbitration;

2.     MedPro is obligated to further defend Plaintiffs going forward in the Genesis Arbitration;

3.     Pursuant to the MedPro Policies, MedPro is obligated to indemnify Plaintiffs against all liability incurred in the Genesis Arbitration;

4.     Awarding Plaintiffs all compensatory and consequential damages against MedPro in an amount to be proven at trial, as well as costs, pre- and post-judgment interest, disbursements, expenses and attorneys' fees incurred arising from this Action and/or establishing coverage under the MedPro Policies;

5.     Awarding Plaintiffs punitive damages against MedPro; and

6.     Awarding such other and further relief as the Court may deem just.

## Count III: Promissory Estoppel

75.     Plaintiffs restate Paragraphs 1 through 74 above as if fully set forth here.

76.    MedPro made certain promises and representations to Plaintiffs, as described in detail above – including in the MedPro Policies, and importantly conceding that the underlying Genesis claims "arise from . . . professional services rendered or which should have been rendered" by Dr. DeWall and WMC (the only way the inapplicable Medicare Endorsement would respond, conceding the Genesis claims trigger "professional services" coverage under the Policies). (Exhibit 6, T. Springman 1/23-24/20 emails to Dr. DeWall, "concur[ring] that [the Policies are] triggered by the Genesis arbitration" and offering to send a coverage "acknowledgment letter that will confirm your coverage" of the Genesis Arbitration under both Policies; T. Springman 4/6/20 email to Dr. DeWall and Kevin Collins, confirming reimbursement of defense costs.)

77.    MedPro expected that Plaintiffs would rely on such promises.

78.    Plaintiffs did in fact rely on such promises to their detriment.

79.    Injustice can only be avoided by enforcement of the promises made by MedPro to Dr. DeWall and WMC.

80.    Plaintiffs have suffered, and will continue to suffer, damages as a proximate result of MedPro's breaches of their promises to Plaintiffs.

WHEREFORE, Dr. DeWall and WMC request that the Court enter the following judgment in their favor and against MedPro:

1.    Awarding Plaintiffs' all non-reimbursed defense expenses incurred in the Genesis Arbitration;

2.    MedPro is obligated to further defend Plaintiffs going forward in the Genesis Arbitration;

3.    Pursuant to the MedPro Policies, MedPro is obligated to indemnify Plaintiffs against all liability incurred in the Genesis Arbitration;

4.      Awarding Plaintiffs all compensatory and consequential damages against MedPro in an amount to be proven at trial, as well as costs, pre- and post-judgment interest, disbursements, expenses and attorneys' fees incurred arising from this Action and/or establishing coverage under the MedPro Policies;

5.      Awarding Plaintiffs punitive damages against MedPro; and

6.      Awarding such other and further relief as the Court may deem just.

<u>Count IV: Bad Faith</u>

81.      Plaintiffs restate Paragraphs 1 through 80 above as if fully set forth here.

82.      A covenant of good faith and fair dealing, that MedPro will do nothing to injure the rights of Plaintiffs in receiving benefits under the MedPro Policies, is implied in the MedPro Policies at issue. As a result, MedPro has a duty to give proper consideration to the interests of Plaintiffs. MedPro failed to do so in responding to the Genesis Arbitration, including MedPro's refusal to continue to defend Plaintiffs against the Genesis Arbitration.

83.      As set forth more fully above, MedPro's coverage positions in response to the Genesis Arbitration are arbitrary and asserted in bad faith, and for the purpose of preventing Plaintiffs from accessing the full coverage they purchased under the MedPro Policies. MedPro has no reasonable basis for asserting their current coverage positions (Plaintiffs are not entitled to coverage for the Genesis Arbitration), especially after "concur[ring] that [the MedPro Policies are] triggered by the Genesis arbitration" and offering to send a coverage "acknowledgment letter that will confirm your coverage", then paying some defense costs incurred by Plaintiffs, all without any reservation of rights letter. (Exhibit 6, T. Springman 1/23-24/20 emails to Dr. DeWall.)

84.     MedPro knew, or had reason to know, that its coverage positions are without a reasonable basis and their coverage positions are asserted willfully and in reckless disregard for Plaintiffs' rights under the MedPro Policies.

85.     As a result of the bad faith of MedPro, Plaintiffs have suffered damages in an amount to be proven at trial. In addition, Plaintiffs are entitled to recover punitive damages and attorneys' fees and other expenses incurred in pursuing its coverage claims in this matter.

WHEREFORE, Dr. DeWall and WMC request that the Court enter the following judgment in their favor and against MedPro:

1.     Awarding Plaintiffs' all non-reimbursed defense expenses incurred in the Genesis Arbitration;

2.     MedPro is obligated to further defend Plaintiffs going forward in the Genesis Arbitration;

3.     Pursuant to the MedPro Policies, MedPro is obligated to indemnify Plaintiffs against all liability incurred in the Genesis Arbitration;

4.     Awarding Plaintiffs all compensatory and consequential damages against MedPro in an amount to be proven at trial, as well as costs, pre- and post-judgment interest, disbursements, expenses and attorneys' fees incurred arising from this Action and/or establishing coverage under the MedPro Policies;

5.     Awarding Plaintiffs punitive damages against MedPro; and

6.     Awarding such other and further relief as the Court may deem just.

Dated:  February 4, 2021                    _____*/s/ Timothy J. Hill*_____
                                            TIMOTHY J. HILL (#LI0015821)
                                                    Direct Dial: (319) 861-8758
                                                    Email: thill@bradleyriley.com
                                                    of
                                            BRADLEY & RILEY PC
                                            2007 First Avenue SE
                                            P.O. Box 2804
                                            Cedar Rapids, IA  52406-2804
                                            Phone: (319) 363-0101
                                            Fax:    (319) 363-9824

                                            and

                                            Andrew Chamberlain (Illinois #6334267)
                                                    Direct Dial: (312) 281-0295
                                                    Email: achamberlain@bradleyriley.com
                                                    of
                                            BRADLEY RILEY JACOBS PC
                                            320 W. Ohio Street, Suite 3W
                                            Chicago IL 60654
                                            Phone: (312) 281-0295
                                            (*Pro hac vice* motion forthcoming)

{02983744.DOCX}                    23